1  EDWARD D. TOTINO (Bar No. 169237)
   Email: edward.totino@dlapiper.com
2  NICK S. PUJJI (Bar No. 259571)
   Email: nick.pujji@dlapiper.com
3  **DLA PIPER LLP (US)**
   2000 Avenue of the Stars, Suite 400
4  Los Angeles, California 90067
   Tel: 310.595.3000
5  Fax: 310.595.3300

6  Attorneys for Plaintiff Receiver
   ROBERT P. MOSIER

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10 ROBERT P. MOSIER, Receiver for       Case No. SACV12-00227 PSG (Ex)
   PRIVATE EQUITY
11 MANAGEMENT GROUP, LLC,               **FIRST AMENDED COMPLAINT**
   AND PRIVATE EQUITY                   **FOR:**
12 MANAGEMENT GROUP, INC.,
                                        **(1) RELIEF BASED ON**
13            Plaintiff,                **RESCISSION**

14       v.                            **(2) DECLARATORY RELIEF**

15 PHOENIX LIFE INSURANCE               **(3) NEGLIGENCE**
   COMPANY; PHL VARIABLE
16 INSURANCE COMPANY, and               **(4) UNJUST ENRICHMENT**
   DOES 1-5, inclusive,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)
  LOS ANGELES      WEST\229693078.1

                        FIRST AMENDED COMPLAINT

1    Pursuant to Federal Rules of Civil Procedure 15(a)(1)(B) and 6(d), Plaintiff

2  Receiver Robert P. Mosier (the "Receiver"), in his capacity as the permanent

3  receiver for Private Equity Management Group, LLC, Private Equity Management

4  Group, Inc., and subsidiaries and affiliates thereof (collectively, "PEMGroup" or

5  the "Receivership Estate"), hereby submits this First Amended Complaint and

6  alleges as follows:

7                                    **PARTIES**

8    1.    Plaintiff Receiver Robert P. Mosier is the Court-appointed permanent

9  receiver for PEMGroup in the action *Securities and Exchange Commission v.*

10  *Private Equity Management Group, LLC; Private Equity Management Group, Inc.;*

11  *and Danny Pang*, Case No. CV09-2901 PSG (EX), pending before the United

12  States District Court for the Central District of California, the Honorable Philip S.

13  Gutierrez presiding.  The Receiver is a resident and citizen of California.

14    2.    Defendant Phoenix Life Insurance Company was, at all times

15  mentioned herein, a corporation organized under the laws of New York with its

16  principal place of business located in Connecticut.  Defendant PHL Variable

17  Insurance Company, a subsidiary of Phoenix Life Insurance Company, was, at all

18  times mentioned herein, a corporation organized under the laws of Connecticut with

19  its principal place of business in Connecticut.  Phoenix Life Insurance Company

20  and PHL Variable Insurance Company are collectively referred to herein as

21  "Phoenix" or "Defendants."  Phoenix conducts significant business in California,

22  and is the life insurance carrier responsible for issuing the life insurance policies at

23  issue in this lawsuit.

24                          **JURISDICTION AND VENUE**

25    3.    This Court has jurisdiction over the subject matter of this action

26  because the claims alleged herein involve Receivership Assets as described in the

27  Court's Preliminary Injunction and Orders Appointing a Permanent Receiver.  That

28  Preliminary Injunction and Orders state that all disputes relating to Receivership

DLA PIPER LLP (US)
LOS ANGELES

WEST\229693078.1

1

FIRST AMENDED COMPLAINT

1  Assets must be filed in this Court.  Furthermore, this Court has subject matter

2  jurisdiction of this action under 28 U.S.C. §§ 754, 1692. This Court also has

3  jurisdiction over this matter under 28 U.S.C. § 1332 as it involves citizens of

4  different states and the amount in controversy exceeds $75,000.

5        4.     Venue for this action is proper in the Central District of California

6  because (1) this action is ancillary to the United States Securities and Exchange

7  Commission proceedings pending in this District; (2) the Receiver was appointed

8  by this Court; (3) this action involves Receivership Assets within the meaning of

9  the Preliminary Injunction and Orders Appointing a Permanent Receiver, which

10  requires that all such disputes be filed in this District; and (4) Defendants operate

11  and conduct business in this District.

12  ## FACTS

13  ### SEC ACTION AND APPOINTMENT OF THE RECEIVER

14        5.     On April 24, 2009, the United States Securities and Exchange

15  Commission ("SEC") filed the action *Securities and Exchange Commission v.*

16  *Private Equity Management Group, LLC; Private Equity Management Group, Inc.;*

17  *and Danny Pang*, Case No. CV 09-2901 PSG (Ex) in the United States District

18  Court for the Central District of California (the "SEC Action").  On April 27, 2009,

19  the Court appointed Mosier & Co. as the temporary receiver of PEMGroup.  On

20  July 2, 2009, the Court granted, and on August 4, 2009 entered, a Preliminary

21  Injunction and Orders appointing Robert P. Mosier of Mosier & Co. as the

22  permanent receiver of PEMGroup.

23        6.     Per the Preliminary Injunction and Orders appointing him, the

24  Receiver has been authorized and directed to secure and preserve PEMGroup's

25  assets for the benefit of its investors.  The Receiver is further authorized and

26  directed to pursue claims against any party, on behalf of PEMGroup, in order to

27  recover and secure assets of the Receivership Estate.

28

DLA PIPER LLP (US)
LOS ANGELES

WEST\229693078.1

2

7.     The Receiver brings this action in order to fulfill and comply with his duties under the Preliminary Injunction and Orders appointing him.

### PEMGROUP'S PURCHASE OF THE POLICIES

8.     PEMGroup consists of a web of subsidiary and affiliate entities operating under the control and management of Private Equity Management Group, LLC and Private Equity Management Group, Inc.  PEMGroup was an investment firm, and was able to solicit hundreds of millions of dollars primarily from institutional investor banks (referred to herein as "investors") for the primary purpose of investing in life insurance policies and other assets.[1]

9.     Over the course of its operations, PEMGroup purchased approximately 289 life insurance policies, or beneficial rights to life insurance policies, issued by a variety of insurance carriers, through various third-party brokers.

10.     On or about March 15, 2005, PEMGroup purchased the ownership and beneficiary rights in a life insurance policy issued by Phoenix on the life of Karl F. Gengler with a face value of $5,000,000 (the "Gengler Policy").  On or about November 16, 2005, PEMGroup purchased the ownership and beneficiary rights in a life insurance policy issued by Phoenix on the life of Jaren E. Hiller with a face value of $6,000,000 (the "Hiller" Policy").  The Gengler Policy and the Hiller Policy are collectively referred to herein as the "Policies."

11.     PEMGroup purchased the Policies issued by Phoenix in good faith and on the basis that these policies were valid, enforceable, and valuable life insurance policies.  PEMGroup had no direct involvement in the application or procurement of the Policies, and specifically purchased the Policies from a third-

---

[1] In addition to using investor funds to purchase investment life insurance policies and other assets, PEMGroup's directors misappropriated and mismanaged some investor funds, and engaged in various other forms of securities fraud, which is the subject of the SEC's Action against PEMGroup and has been confirmed by the Receiver.  Nevertheless, PEMGroup acted as a good faith purchaser for value with the respect to the life insurance policies it purchased, including the life insurance policies at issue in this action.

party broker named Five Star Financial. Based on the belief that Phoenix issued valid life insurance policies, on which Phoenix would pay the death benefits at the time each of the Policies matured, PEMGroup purchased the Policies for a total of approximately $1,680,000 and PEMGroup, along with the previous owners of the Policies, paid approximately $4,800,000 in premium payments to Phoenix in order to maintain the Policies.[2] Through its purchase of the Policies, PEMGroup reimbursed all previous owners of the Policies for the premiums they paid, making PEMGroup the sole payor of premiums under the Policies.

### PHOENIX'S LIFE INSURANCE SCHEME

12.     Phoenix has engaged in a scheme to maximize the receipt of premiums for itself, and commissions and bonuses for its agents and employees, while avoiding its contractual obligations under the life insurance policies it has issued.

13.     Based on Phoenix's filings with the Securities and Exchange Commission, between 2005 and 2008 Phoenix purposely became a very active issuer of stranger owned life insurance ("STOLI") policies. Phoenix was well aware of the fact that the life insurance policies it issued would be sold in the secondary market. In fact, between 2007 and 2008, The Phoenix Companies, Phoenix's publicly-traded parent company, formed a subsidiary named "Phoenix Life Solutions," which participated in the secondary life insurance market. Among other things, the purpose of Phoenix Life Solutions was to re-purchase life insurance policies that Phoenix itself issued in exchange for immediate cash settlements. In other words, not only did Phoenix knowingly issue life insurance policies to be sold on the secondary market, but it also sought to profit in the

---

[2] The Receiver is informed and believes that Phoenix has collected approximately $4,868,975.82 in premiums from the Policies, of which PEMGroup has directly paid $4,795,943.62 and the remainder of which PEMGroup has paid through its purchase of the Policies. PEMGroup paid approximately $1,680,000 to purchase the Policies. Prior to the Receiver's appointment, PEMGroup paid approximately $2,888,057.04 in premiums towards the Policies. Under the Receiver's control, PEMGroup has paid an additional $1,907,886.58 in premiums towards the Policies.

1    secondary market as a purchaser of the policies it issued.

2        14.    By issuing STOLI policies, Phoenix's goal was to maximize premium

3    revenue, which, in turn, produced commissions and bonuses to its agents, brokers,

4    producers, sales representatives and its personnel. The Receiver is informed and

5    believes that such growth in premium revenue also served to make it appear to the

6    investing public and the rating agencies that the insurance business of Phoenix was

7    growing and keeping pace with its competitors.

8        15.    The Receiver is informed and believes that in order to maximize

9    premiums, commissions and bonuses, Phoenix engaged in several tactics, including

10   targeting elderly individuals, whom Phoenix encouraged to purchase multi-million

11   dollar life insurance policies. Based on its corporate policies, Phoenix encouraged

12   its agents to apply for as many STOLI policies as possible. The more policies

13   Phoenix could issue, the more premiums it could receive. In turn, Phoenix did little

14   to consider the information provided by applicants in policy applications prior to

15   policy issuance. Phoenix turned a blind eye to the information provided by

16   applicants in order to maximize the number of life insurance policies it could

17   approve and issue. For example, Phoenix regularly failed to verify information

18   such as an applicant's financial status and net worth before issuing a policy. The

19   foregoing policies and procedures are apparent from the documents and

20   communications in the underwriting files for the life insurance policies Phoenix

21   issued.

22       16.    The Receiver is informed and believes that Phoenix was not

23   concerned with the potential exposure it faced from mass-issuing STOLI policies

24   because Phoenix did not intend to honor its obligations under these policies in all

25   circumstances where it would be required to do so. Phoenix viewed the emerging

26   secondary life insurance market as an opportunity to increase its premium revenue

27   and, at the same time, avoid the costs arising from proper pre-policy issuance

28   underwriting and death benefit payments, by intending to avoid its obligations

1  under the STOLI policies it issued.  Phoenix was not concerned with investigating

2  the policies it issued because it always retained the option of not honoring the

3  Policies when it was advantageous to do so.

4       17.     Phoenix's conduct illustrates and confirms its bad faith intentions.

5  After knowingly mass-issuing STOLI policies and collecting hefty premiums on

6  these policies, Phoenix regularly seeks to rescind life insurance policies that are

7  similar to the Policies at issue in this case, while at the same time seeking to keep

8  all the premiums charged on those policies.  Phoenix seeks to avoid its obligations

9  under life insurance policies it issues through aggressive lawsuits that it files all

10  over the nation.[3]  In California Federal Courts alone, Phoenix has sought the

11  rescission of at least fourteen policies issued under similar circumstances as the

12  Policies at issue in this case.[4]

13  [3] (See PHL Variable Insurance Company v. 2008 Christa Joseph Irrevocable Trust, Docket No.
14  0:10-cv-03001 (D. Minn. Jul 14, 2010), Complaint; PHL Variable Insurance Company v. U.S. Bank National Association, Docket No. 1:12-cv-00318 (D. Del. Mar 15, 2012), Complaint; PHL
15  Variable Insurance Company v Virginia L. Lankow Life Insurance Trust, Docket No. 1:12-cv-00315 (D. Del. Mar 15, 2012), Complaint; PHL Variable Insurance Company v. Edwin Fund
16  Insurance Trust, Docket No. 1:12-cv-00313 (D. Del. Mar 15, 2012), Complaint; PHL Variable Insurance Company v. Helene Small Insurance Trust, Docket No. 1:12-cv-00312 (D. Del. Mar
17  15, 2012), Complaint; PHL Variable Insurance Company v Chong Son Pak Life Insurance Trust, Docket No. 1:12-cv-00314 (D. Del. Mar 15, 2012), Complaint; PHL Variable Insurance
18  Company v. ESF QIF Trust, Docket No. 1:12-cv-00317 (D. Del. Mar 15, 2012), Complaint; PHL Variable Insurance Company v. ESF QIF Trust, Docket No. 1:12-cv-00319 (D. Del. Mar 15,
19  2012), Complaint; Credit Suisse Lending Trust (USA) 2 et al v. Phoenix Life Insurance Company et al, Docket No. 1:11-cv-00054 (D.N.H. Feb. 04, 2011), Complaint; PHL Variable Insurance Co.
20  v. Jay Doss Irrevocable Life Insurance Trust, Docket No. 3:10-cv-02033 (D. Conn. Dec. 28, 2010), Complaint; PHL Variable Insurance Company v. Segelke et al, Docket No. 2:10-cv-02050
21  (D. Nev. Nov 23, 2010), Complaint; PHL Variable Insurance Co. v. Dolores C. Painter Irrevocable NJ Trust et al, Docket No. 2:10-cv-03603 (D.N.J. Jul 16, 2010), Complaint; and PHL
22  Variable Insurance Company v. U.S. Bank National Association et al, Docket No. 0:10-cv-01197 (D. Minn. Apr. 08, 2010), Complaint.)
23  [4] (See PHL Variable Insurance Co. v. The Hyman Davidson 2008 Irrevocable Life Insurance Trust, Docket No. 3:10-cv-01219 (S.D. Cal. June 08, 2010), Complaint; PHL Variable Insurance
24  Co. v. The Patricia Sanford Family Insurance Trust et al, Docket No. 3:10-cv-00784 (S.D. Cal. Apr. 14, 2010), Complaint; PHL Variable Insurance Co. v. Giordano et al, Docket No. 3:10-cv-
25  00771 (S.D. Cal. Apr. 13, 2010), Complaint; PHL Variable Insurance Co. v. Kristian Giordano et al, Docket No. 2:10-cv-02370 (C.D. Cal. Mar. 31, 2010), Complaint; PHL Variable Insurance Co.
26  v. Giordano et al, Docket No. 3:10-cv-00661 (S.D. Cal. Mar. 26, 2010), Complaint; PHL Variable Insurance Co. v. Kristian Giordano et al, Docket No. 1:10-cv-00568 (E.D. Cal. Mar. 31, 2010),
27  Complaint; PHL Variable Insurance Co. v. The Abrams Family Irrevocable Life Insurance Trust, Docket No. 3:10-cv-00521 (S.D. Cal. Mar 11, 2010), Complaint; PHL Variable Insurance Co. v.
28  The James Evans Family Insurance Trust, Docket No. 3:10-cv-00240 (S.D. Cal. Jan. 29, 2010), Complaint; PHL Variable Insurance Co. v. The Joo I. Park 2007 Irrevocable Trust, Docket No.

18. In addition to Phoenix filling court dockets around the nation with its lawsuits seeking to avoid its contractual obligations under the life insurance policies it issued, the Receiver is informed and believes that Phoenix's bad faith intention to not honor all of its policies is further confirmed by the percentage of policies Phoenix refuses to honor upon receiving a claim. Based on annual statements submitted by life insurance carriers, the Receiver is informed and believes that the industry rate for the denial of life insurance benefits is less than 5%, whereas Phoenix has reported in its 2011 Annual Statement that it denies more than 15% of the claimed life insurance it receives. These facts confirm Phoenix's intention to not honor the life insurance policies it issued with certainty, but instead to retain the option to challenge the policies upon maturity or earlier, including by commencing litigation aimed at avoiding its obligations.

19. In sum, Phoenix's scheme allowed it to collect millions of dollars in premium payments without being obligated to honor all of the policies it issued, to the detriment of innocent individuals and investors. Phoenix knowingly issued life insurance policies for the sole purpose of resale in the secondary market in order to boost its profits, and even formed a division dedicated to the purchase of life insurance policies in the secondary market. Phoenix was eager to issue these policies and encouraged its agents to apply for these policies on behalf of targeted individuals, while Phoenix turned a blind eye to the information presented in policy applications. Phoenix was not concerned with its lax standards for the masses of STOLI policies it issued because, after collecting hefty premiums, Phoenix did not intend to honor all of these policies, but would instead only honor certain policies

2:09-cv-09450 (C.D. Cal. Dec. 24, 2009), Complaint; PHL Variable Insurance Co. v. Dong Woon Cho Life Insurance Trust, Docket No. 2:09-cv-08923 (C.D. Cal. Dec. 04, 2009), Complaint; PHL Variable Insurance Co. v. Dook Soock Park 2007 Irrevocable Trust, Docket No. 2:09-cv-08714 (C.D. Cal. Nov. 25, 2009), Complaint; PHL Variable Insurance Co. v. Kenneth Green Family Insurance Trust, Docket No. 3:09-cv-02606 (S.D. Cal. Nov 18, 2009), Complaint; PHL Variable Insurance Co. v. Clifton Wright Family Insurance Trust, Docket No. 3:09-cv-02344 (S.D. Cal. Oct. 21, 2009), Complaint; and PHL Variable Insurance Co. v. Alberto Rubio Family Insurance Trust et al, Docket No. 2:09-cv-04652 (C.D. Cal. June 26, 2009), Complaint.)

1   when it suited Phoenix's interests.  Phoenix's bad faith intentions are confirmed by

2   the hoards of lawsuits it has filed around the country seeking to avoid its

3   obligations under the policies it has issued (while, of course keeping the premiums

4   it has collected) and by the high rate at which it denies coverage.  Rather than deny

5   applications up front, Phoenix figured out a way to first collect premiums on the

6   policies it issued, and deny the policies afterwards, thereby obtaining unjustified

7   gains.  Phoenix's conduct is offensive to and undermines the certainty of payment

8   that is at the heart of a life insurance relationship.

9                              PHOENIX'S ISSUANCE OF THE POLICIES

10       20.     The Receiver is informed and believes that the Policies PEMGroup

11   purchased are part of Phoenix's scheme.  Phoenix issued the Policies, knowing that

12   they were or would become STOLI policies, in order to collect hefty premiums on

13   the Policies, while at the same time not intending to honor its obligations under the

14   Policies in all required circumstances, but instead to make a decision at a later time

15   on whether to honor them.

16       21.     Phoenix knew that the Policies were STOLI policies.  Prior to

17   PEMGroup's purchase of the Policies, Phoenix originally issued the Policies to the

18   Heritage Christian School, a religious-affiliated school that was provided the

19   interests in the Policies as a charitable donation.  Based on its records, Phoenix

20   knew, or should have known, that the Heritage Christian School was regularly used

21   as an original beneficiary for STOLI policies.  Additionally, documents and

22   correspondence in the underwriting files for the Policies reference an entity named

23   Five Star Financial, a known third party broker for STOLI policies and the party

24   from whom PEMGroup purchased the Policies.  Documents and communications in

25   the underwriting files also reference the sale of the policies and gross buy-out

26   offers.

27

28

22.    The Policies were applied for by a Phoenix insurance agent named Barbara Incandela, along with another Phoenix agent named William White (who also happened to be the CEO of Five Star Financial, the entity from which PEMGroup purchased the Policies). Barbara Incandela, and her husband Richard Incandela, were known to be STOLI promoters, and were known to apply for life insurance policies on behalf of individuals seeking to donate money to charities and/or strangers for the purpose of re-selling these policies. The Incandelas are further known to be widely accused of engaging in fraudulent business practices and having a questionable reputation in the life insurance industry. William White was also known to be a STOLI promoter, as the CEO of a secondary market life insurance broker.[5]

23.    Barbara Incandela was an applying agent on both of the Policies, and the initial premium checks for the Policies were paid by the Incandelas (Solutions Enterprises of America, Inc, an entity controlled by Richard Incandela, paid the initial premium payment on the Gengler Policy, while Barbara Incandela paid the initial premium payment on the Hiller Policy). The original beneficiary under the Policies, the Heritage Christian School, did not write, nor endorse, these initial premium payments. Additionally, Barbara Incandela entered her own email address as the contact email address for the Heritage Christian School.

24.    Phoenix approved and issued the Policies, despite the fact that Phoenix knew or should have known that the agents' reputations and practices in the STOLI industry, despite the fact that Phoenix knew that the Policies would be re-sold, and despite the fact that the initial premium payments came directly from one of the agents (and her husband) and Barbara Incandela's contact information was provided in place of the beneficiary's contact information.

---

[5] William White, a known STOLI promoter, was part of Phoenix's "Exceptional Producer Program," demonstrating that Phoenix awarded and encouraged agents to promote STOLI policies, under which Phoenix would later turn around and seek to avoid its obligations.

25.     The Receiver is informed and believes, and on that basis alleges, that Phoenix ignored warnings from its underwriting department regarding the Agents applying for the Policies (or that its underwriting department neglected to provide such warnings) and the questionable circumstances surrounding the applications, and instead chose to issue the Policies despite these warnings and circumstances. The underwriting files for the Policies each contain a low level of verifications on the information presented. For example, neither of the insureds under the Policies were required to prove their stated wealth, despite internal underwriting notes on the Gengler Policy stating "financially looks unjustified." Consistent with its scheme, Phoenix turned a blind eye to the information presented in, and questionable circumstances surrounding, the applications for the Policies and eagerly approved the Policies.

26.     The Receiver is informed and believes, and on that basis alleges, that Phoenix issued the Policies to generate income and profits for itself, despite Phoenix's knowledge and suspicion regarding the Policies, and without the intention of honoring the Policies. Indeed, Phoenix has now collected approximately $4,800,000 in premium payments under these Policies, and has indicated that it will not honor the policies.

## PHOENIX INDICATES IT WILL NOT HONOR THE POLICIES

27.     Through its communications with the Receiver and specific conduct tied to its scheme, Phoenix has indicated that it does not intend to honor its obligations under the Policies. Over the course of his appointment, the Receiver has worked diligently to analyze the value of and secure PEMGroup's assets, which include the hundreds of investment life insurance policies PEMGroup purchased and maintained. As part of his efforts, and based on concerns regarding whether Phoenix would honor the life insurance policies it issued, the Receiver requested that Phoenix verify in writing that it would honor its contractual obligations under the Policies when they matured. Phoenix refused to do so.

28.     Further, as part of its STOLI scheme, Phoenix is notorious for attempting to avoid its obligations under the policies it has issued through litigation or by simply denying the claims it receives. Phoenix turned a blind eye to life insurance policies it issued in order to collect premiums on as many policies as possible. And after issuing these policies, Phoenix regularly attempts to avoid its obligations under these policies while expecting to keep the premiums it has issued. Phoenix's conduct within the STOLI industry indicates that it will not honor its obligations under the Policies in this case, or at best, that it is questionable whether Phoenix will honor its obligations.

29.     Despite refusing to confirm that it will honor its obligations under the policies, and consistent with its unfair industry practices of widely challenging, and/or failing to honor in good faith, the life insurance policies it issues, Phoenix refuses to return the premiums it has collected under the Policies.

30.     In this case alone, Phoenix's conduct has allowed it to collect approximately $4,800,000 in premium payments, while PEMGroup and the Receiver are left with worthless life insurance policies. These policies have been made worthless because Phoenix refuses to confirm their validity, and Phoenix's conduct indicates that it will likely attempt to challenge the Policies. Insurance policies without guaranteed benefits have no value. Phoenix's conduct has therefore diminished the value of the Policies.

### THIS LAWSUIT IS RIPE FOR JUDICIAL DETERMINATION

31.     This lawsuit is ripe for judicial determination on multiple grounds.

32.     As detailed above, Phoenix's refusal to confirm whether it will honor its obligations under the Policies, and its public efforts to avoid its obligations under similar life insurance policies, eliminated or diminished the value of the Policies, which gives rise to the Receiver's claims. These factors entitle the Receiver to bring the causes of action stated below.

33.     This dispute is further ripe for judicial determination because Phoenix currently expects the Receiver and PEMGroup to continue making significant premium payments towards the Policies, while refusing to confirm whether Phoenix will honor the Policies.  Phoenix wants PEMGroup to continue making premium payments on the Policies so that Phoenix can later refuse to honor the Policies and retain the premiums.  *At best*, it is uncertain whether Phoenix will honor its obligations, and this uncertainty destroyed the very essence of the insurance relationship.  It is therefore crucial to have a judicial determination on the Receiver's claims now.  But for PEMGroup's rescission of the Policies, the Receiver and PEMGroup may be obligated to pay more premiums to Phoenix, without any confirmed future benefit and in furtherance of Phoenix's scheme.  Thus, a judicial determination is needed now.

34.     Finally, this controversy is ripe for judicial determination on the basis that Phoenix has failed to provide *coverage* under the Policies.  The primary benefit of purchasing life insurance is obtaining security through the knowledge that death benefit proceeds will be paid at the time of a policy's maturity.  This security is the heart of every life insurance policy.  Phoenix refuses to provide and has undermined that security, thereby failing to provide the inherent consideration behind the Policies, which is *knowing* coverage exists.  Therefore, Phoenix has caused the consideration it provided to the policy holders, including PEMGroup and the Receiver, to fail.  As a result, the Receiver has rescinded the Policies and seeks the return of premiums paid.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## (RELIEF BASED ON RESCISSION)

35.     Plaintiff Receiver incorporates the allegations set forth above as if fully set forth herein.

36.     The Receiver is informed and believes, and on that basis alleges, that Phoenix issued the Policies, despite the fact that Phoenix knew or should have known that it would not honor its obligations under the Policies in all required circumstances, but instead would decide at a later time whether to honor the Policies, after having collected hefty premiums.  Phoenix ignored the applying agents' (Barbara Incandela, and by affiliation her husband Richard Incandela, and William White) reputations and practices in the life insurance industry, the fact that Phoenix knew or should have known that the Policies would be re-sold as STOLI policies, and additional questionable information presented in the applications and initial premium payments for the Policies.

37.     Phoenix knew, or should have known, that it would retain the option to not provide coverage for and honor the Policies, based on its knowledge regarding the agents applying for the Policies, its knowledge that the policies were STOLI policies, and the circumstances surrounding the application and issuance of the Policies.  Nevertheless, Phoenix failed to disclose its knowledge, or take appropriate measures in response to this knowledge, and proceeded to issue the Policies in order to collect hefty premiums that currently amount to approximately $4,800,000.  Phoenix's conduct was an intentional device, scheme, act, connivance, and/or business practice which yielded significant profits to Phoenix to the detriment of PEMGroup and the Receiver.

38.     Through the specific language in the Policies, Phoenix knowingly represents that it will pay the death benefits on the Policies at the time of maturity, if the requisite premiums are paid.  On page 13 of the Gengler Policy Phoenix made the representation that: "Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy." Similarly, on page 13 of the Hiller Policy Phoenix made the representation that: "Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy."

39.     At the time of making representations in the Policies, Phoenix knew or should have known that it would not always fulfill these obligations in good faith. PEMGroup and the Receiver reasonably relied on the representations, warranties and covenants Phoenix made in the Policies, including that the Policies were valid life insurance policies and that Phoenix would honor its obligations under the Policies at the time of maturity. Yet, through its refusals and conduct, Phoenix has indicated that it will not honor the Policies, or at best it is uncertain whether Phoenix will honor the Policies. As such, the consideration under the Policies for which PEMGroup and the Receiver have paid millions of dollars has become void and/or materially failed. As a result of relying on Phoenix's misrepresentations in the Policies, the Receiver and PEMGroup have suffered millions of dollars in damages.

40.     Based on the representations, warranties and covenants Phoenix made through the Policies, PEMGroup paid significant sums of money to purchase the Policies, and PEMGroup and the Receiver have paid significant sums of money to maintain the Policies in the form of insurance premium payments.

41.     By virtue of Phoenix's representations, concealment, and acts, and the failure of consideration, pursuant to California Civil Code section 1689(b), PEMGroup and the Receiver are entitled to rescission of the Policies and a return of all premiums paid under the Policies.

42.     Based upon Phoenix's misrepresentations and connivance described above, PEMGroup was duped into purchasing and assuming the ownership and beneficiary rights and obligations under the Policies. But for Phoenix's connivance, PEMGroup would not have purchased and maintained the Policies.

43.     Moreover, based on Phoenix's refusals and public conduct, the consideration under the Policies has failed. The consideration under the policies is (1) the payment of the death benefits by Phoenix at the time of maturity; and (2) the security of knowing Phoenix will do so, and therefore that insurance coverage

14

exists. Phoenix has caused both to fail. Phoenix has indicated that it will not honor its obligations under the Policies. And at best, Phoenix has made it unclear whether it intends to honor its obligations under the Policies. By doing so, Phoenix has undermined the inherent consideration behind the Policies, which is *knowing* coverage exists and that benefits will be paid. Accordingly, Phoenix's conduct has caused the consideration under the Policies to fail.

44. **The original Complaint in this matter provided the requisite notice of rescission and was sufficient itself to effectuate the rescission under California Civil Code section 1691.** This First Amended Complaint reaffirms such notice. Pursuant to California Civil Code section 1691, PEMGroup and the Receiver are ready, willing and able to release Phoenix from any obligations under the Policies and accept a return of the premiums paid for the Policies.

45. PEMGroup and the Receiver demand the return and restoration of all consideration Phoenix received under the Policies, including, but not limited to, the approximately $4,800,000 in insurance premiums paid by PEMGroup and the Receiver.

46. Pursuant to California Civil Code section 1692, PEMGroup and the Receiver will elect their final remedies after a trial upon presentation of the evidence.

## SECOND CAUSE OF ACTION
### (DECLARATORY RELIEF)

47. Plaintiff Receiver incorporates the allegations set forth above as if fully set forth herein.

48. Phoenix issued the Policies to the Heritage Christian School, at the request of the applying agents. Thereafter, PEMGroup purchased the Policies through a third-party broker, Five Star Financial. Before issuing the Policies, Phoenix knew, or should have known, that the agents applying for the Policies intended to re-sell the Policies to a third-party buyer, that the agents had a

15

1 reputation for doing so, and that information provided in the application, and initial

2 premium payments, for the Policies were STOLI policies that Phoenix did not

3 intend to honor.

4      49.    Additionally, Phoenix knew, or should have known, that it would

5 retain the right to contest the Policies and therefore would refuse to confirm

6 whether it would honor its obligations under the Policies in the future, negating any

7 consideration it provided in exchange for the policy premium payments.

8      50.    The Receiver is informed and believes that Phoenix issued the

9 Policies, despite Phoenix's knowledge of the foregoing, including that it did not

10 intend to honor the Policies with certainty but instead only at its option. Phoenix

11 concealed and failed to disclose this information.

12      51.    The Receiver is informed and believes that Phoenix issued the

13 Policies to generate income and profits for itself, despite Phoenix's knowledge

14 regarding, and intent not to honor, the Policies. Indeed, these Policies were issued

15 as part of Phoenix's scheme to turn a blind eye to the STOLI policies it issued in

16 order to maximize the premiums it could collect, and later attempt to avoid its

17 obligations under the policies it issued.

18      52.    Phoenix has been paid approximately $4,800,000 in premium

19 payments by PEMGroup and the Receiver (and related parties), based on

20 PEMGroup and the Receiver's reasonable reliance that Phoenix issued valid life

21 insurance policies for which Phoenix would honor its obligations and that this

22 would provide the certainty of coverage that is at the heart of owning a life

23 insurance policy.

24      53.    Phoenix refused to confirm whether it intends to honor its obligations

25 under the Policies, and by its actions, has indicated that it will not honor the

26 Policies by continuing to challenge and avoid its obligations under hundreds of life

27 insurance policies it has issued. Consistent with this misconduct, Phoenix has

28 refused to return any of the premiums it has collected under the Policies.

16

54.     As such, PEMGroup and the Receiver are entitled to a judicial declaration that the Policies Phoenix issued were void *ab initio* or voidable, that no additional insurance premiums are due on the Policies, and that Phoenix must return all premiums paid for the Policies to the Receiver.

## THIRD CAUSE OF ACTION

## (NEGLIGENCE)

55.     Plaintiff Receiver incorporates the allegations set forth above as if fully set forth herein.

56.     As a life insurance carrier, Phoenix had statutory and common law duties to use a reasonable degree of skill and care in conducting its business, which includes issuing life insurance policies.  Phoenix owed these duties to the parties to whom it issued life insurance policies, as well as the secondary market purchasers who Phoenix undeniably knew would acquire these policies.  Phoenix was well aware that its policies would be sold to secondary market purchasers, and at times, even purchased its own policies through a subsidiary of its parent corporation.  Phoenix profited tremendously from its knowing and express issuance of STOLI policies, and cannot deny that it owed a duty to foreseeable secondary market purchasers.

57.     Phoenix specifically owed statutory and common law duties to use a reasonable degree of skill and care to PEMGroup and the Receiver.  PEMGroup was a secondary market purchaser of the Policies, and as such was owed a duty based on Phoenix's knowledge that the Policies would be sold in the secondary market.  Based on documents and communications in the underwriting files for the Policies, and the applications for the Policies, Phoenix undeniably knew that these Policies would be re-sold.

58.     Moreover, PEMGroup purchased and assumed all ownership and beneficiary rights under the Policies.  Accordingly, PEMGroup was in privity of contract with Phoenix under the Policies.  Finally, by the terms of the Court's

17

1   Preliminary Injunction and Orders appointing him, the Receiver stands in

2   PEMGroup's shoes and assumes all positions and rights within PEMGroup.

3   Accordingly, the duties owed by Phoenix to PEMGroup are also owed to the

4   Receiver.

5        59.    Phoenix breached its duties to use a reasonable degree of skill and

6   care by engaging in the conduct set forth above, which includes, but is not limited

7   to, issuing the Policies despite its knowledge that it would not honor, or not confirm

8   its intentions to honor, the Policies, and ignoring and/or failing to investigate the

9   parties applying for and obtaining interests to the Policies.

10        60.    Phoenix further breached its duties to use a reasonable degree of skill

11   and care by turning a blind eye to the facts surrounding the life insurance policies it

12   issued in order to maximize its revenue from premiums, while at the same time

13   planning to avoid its obligations under these policies and still keep the premiums it

14   collected.

15        61.    The breach of such duties by Phoenix has caused PEMGroup and the

16   Receiver to suffer significant damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## (UNJUST ENRICHMENT)

19        62.    Plaintiff Receiver incorporates the allegations set forth above as if

20   fully set forth herein.

21        63.    The alleged wrongful conduct regarding the issuance of faulty life

22   insurance policies by Phoenix has resulted in continuous, connected, and on-going

23   harm to PEMGroup and its investors.

24        64.    By its wrongful acts and omissions, Phoenix has been unjustly

25   enriched at the expense of and to the detriment of PEMGroup and the Receiver in

26   an amount of approximately $4,800,000.  Phoenix has been unjustly enriched as a

27   result of the insurance premiums it collected under the Policies it improperly issued

28   and the validity of which Phoenix refused to confirm.

DLA PIPER LLP (US)
Los Angeles

WEST\229693078.1

18

65.     Phoenix has been unjustly enriched because it accepted hefty premiums without the intention to honor its obligations under the Policies.  Now, Phoenix is attempting to walk away with the premiums paid, and has provided nothing to PEMGroup or the Receiver in exchange.

66.     PEMGroup and the Receiver seek restitution from Phoenix, and an order of this Court disgorging all profits, benefits, and other compensation obtained by Phoenix stemming from its wrongful conduct and breaches of duties relating to the Policies.  It is absolutely unjust for Phoenix to retain the large sum of premiums it has charged, yet refuse to confirm that it would honor its obligations under the Policies.  Phoenix's actions are especially egregious, considering the losses PEMGroup investors have already suffered.

67.     The Receiver and PEMGroup are forced to seek restitution due to Phoenix's invalidation of the certainty at the heart of the insurance relationship, and failure to confirm its intentions to honor its obligations under the Policies.  The ineffectiveness of the Policies is further confirmed by Phoenix's conduct and actions with regards to similar life insurance policies it has issued.

68.     The Policies at issue in this case do not preclude this cause of action because Phoenix refused to confirm that they are binding, enforceable agreements, thereby obligating the Receiver to bring this unjust enrichment claim.

69.     Plaintiff Receiver and PEMGroup have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Receiver prays for judgment against Defendants as follows:

A.     For an order confirming that the Policies have been rescinded;

B.     For a return of all consideration paid for the policies;

C.     For damages in an amount to be proven at trial;

DLA Piper LLP (US)
Los Angeles

WEST\229693078.1

FIRST AMENDED COMPLAINT

1        D.      For an order declaring the Policies void and directing Defendants to

2 return to the Receiver all premium payments received under the Policies;

3        E.      For costs of suit herein incurred; and

4        F.      For such other and further relief as the Court may deem proper.

5

6 Dated: March 26, 2012              **DLA PIPER LLP (US)**

7

8                               By _____

9                                   EDWARD D. TOTINO
                                   NICK S. PUJJI

10                                    Attorneys for Plaintiff
                                   Receiver Robert P. Mosier

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 2000 Avenue of the Stars, Suite 400, North Tower, Los Angeles, California  90067.  On March 26, 2012, I served the within documents:

**FIRST AMENDED COMPLAINT FOR: (1) RELIEF BASED ON RESCISSION, (2) DECLARATORY RELIEF, (3) NEGLIGENCE, (4) UNJUST ENRICHMENT**

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

KENNETH G. PARKER (SBN 182911)
kenneth.parker@haynesboone.com
WILLIAM O'NEILL (SBN 251071)
william.oneill@haynesboone.com
HAYNES AND BOONE, LLP
18100 Von Karman Ave., Suite 750
Irvine, California 92612
Telephone: (949) 202-3000
Facsimile: (949) 202-3154

THOMAS F. A. HETHERINGTON (Texas Bar No. 24007359)*
E-Mail: tom.hetherington@emhllp.com
JARRETT E. GANER (Texas Bar No. 24055570)*
E-Mail: jarrett.ganer@emhllp.com
EDISON, McDOWELL & HETHERINGTON LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850

Attorneys for Defendants
PHOENIX LIFE INSURANCE COMPANY
AND PHL VARIABLE INSURANCE COMPANY

I declare that I am employed in the office of a member of the Bar of California or permitted to practice before this Court at whose direction the service was made.

Executed on March 26, 2012, at Los Angeles, California.

_____
Susan Byrd

- 1 -

PROOF OF SERVICE

DLA PIPER US LLP

WEST\229666037.1