1  EDWARD D. TOTINO (Bar No. 169237)
   Email: edward.totino@dlapiper.com
2  NICK S. PUJJI (Bar No. 259571)
   Email: nick.pujji@dlapiper.com
3  **DLA PIPER LLP (US)**
   2000 Avenue of the Stars, Suite 400
4  Los Angeles, California 90067
   Tel: 310.595.3000
5  Fax: 310.595.3300

6  Attorneys for Plaintiff Receiver
   ROBERT P. MOSIER

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10 ROBERT P. MOSIER, Receiver for      Case No. SACV12-00227 PSG (Ex)
   PRIVATE EQUITY
11 MANAGEMENT GROUP, LLC,             **RECEIVER'S OPPOSITION TO**
   AND PRIVATE EQUITY                 **DEFENDANTS' MOTION TO**
12 MANAGEMENT GROUP, INC.,            **DISMISS FIRST AMENDED**
                                      **COMPLAINT**
13              Plaintiff,

14        v.
                                      Date:    August 6, 2012
15 PHOENIX LIFE INSURANCE            Time:    1:30 p.m.
   COMPANY; PHL VARIABLE             Ctrm:    880-Roybal
16 INSURANCE COMPANY, and            Judge:   Hon. Philip S. Gutierrez
   DOES 1-5, inclusive,
17
                Defendants.
18

19

20

21

22

23

24

25

26

27

28

1    Plaintiff Receiver Robert P. Mosier (the "Receiver"), in his capacity as the

2    permanent receiver for Private Equity Management Group, LLC, Private Equity

3    Management Group, Inc., and subsidiaries and affiliates thereof (collectively,

4    "PEMGroup" or the "Receivership Estate"), hereby opposes Defendants' Phoenix

5    Life Insurance Company's and PHL Variable Insurance Company's (collectively,

6    "Phoenix" or "Defendants") Motion to Dismiss Plaintiff's First Amended

7    Complaint (the "Motion").

8    ## I.    INTRODUCTION

9    The Receiver has filed this action against Phoenix to recover the estimated

10   $4.8 million in premium payments (plus additional damages) that have been paid to

11   maintain two separate life insurance policies issued by Phoenix and purchased by

12   PEMGroup as investment assets.[1]  Phoenix has a long history of attempting to

13   avoid its obligations under insurance policies that were sold to investors, thereby

14   undermining the very heart of the insurance relationship – the certainty of payment

15   upon maturity. When the Receiver learned of Phoenix's *modus operandi* in this

16   area, yet was obligated to continue making substantial premium payments on the

17   Policies, he asked Phoenix to confirm that it would honor the Policies.  Phoenix

18   refused to do so, thereby negating the very consideration for the premium payments

19   made by the Receiver and PEMGroup.  Faced with Phoenix's refusal, the Receiver

20   was left with no choice but to rescind the policies and seek return of the premiums

21   paid.

22   While Phoenix makes a number of arguments in a desperate attempt to obtain

23   dismissal of the Receiver's claims, perhaps the most telling aspect of Phoenix's

24   Motion is what Phoenix does *not* say – Phoenix *never* says that it would have paid

25   the Receiver the death benefits under the Policies once they matured.  This

---

[1] The first on the life of Karl F. Gengler with a face value of $5,000,000 (the "Gengler Policy"), the second on the life of Jaren E. Hiller with a face value of $6,000,000 (the "Hiller Policy") (the Gengler Policy and the Hiller Policy are collectively referred to herein as the "Policies").

admission by omission is fatal to Phoenix's Motion and demonstrates that the consideration for the Policies did truly fail, and that the Policies were properly rescinded.  Phoenix cannot keep the hefty $4.8 million in premium payments it collected on the Policies when it in fact never provided the promised coverage.  This would be unfair, and it is the Receiver's responsibility to recover this money from Phoenix on behalf of the Receivership Estate and its investors.

Indeed, as alleged in the First Amended Complaint ("FAC"), Phoenix's actions towards the Policies are part of a much larger scheme in which Phoenix eagerly promoted Stranger Owned Life Insurance ("STOLI") policies – life insurance policies that were issued and subsequently sold to secondary parties (e.g., investor firms like PEMGroup), in order to maximize its premium revenue, while at the same time intending to later avoid its obligations under these policies through aggressive litigation and denying coverage at a rate that is multiple times higher than the industry standard.[2]  (FAC, ¶¶ 12-19.)  Indeed, Phoenix's scheme and reputation are well-known and, beyond the Receiver's action, Phoenix currently faces at least one other similar lawsuit containing parallel claims in the Central District of California.[3]

The Receiver alleges claims in the FAC for:  (1) Relief Based on Rescission; (2) Declaratory Relief; (3) Negligence; and (4) Unjust Enrichment.  Phoenix attacks each of these claims and argues that this case is not ripe for judicial determination

---

[2] Phoenix tries to cast doubt on the Receiver's claims by pointing out that the Receiver has sold other life insurance policies that were issued by Phoenix and held by PEMGroup.  (Motion, p. 7.)  This is a mere distraction, raises matters outside the pleadings, and had no relevance to the Receiver's claims.  Part of the Receiver's primary duties is to preserve and/or liquidate assets of the Receivership Estate in order to return funds to victim investors.  This applies to all of the life insurance policies the Receiver has sold and/or transferred over the course of the Receivership.  Moreover, the policies Phoenix refers to were sold as a bundle with other non-Phoenix policies, valued in the aggregate.  Finally, Phoenix never refused to confirm the validity of these separate policies that are not the subject of this lawsuit.

[3] *See* Complaint filed on June 5, 2012 in *Wilmington Savings Fund Society, FSB, et al. v. PHL Variable Insurance Company, Phoenix Life Insurance Company, and the Phoenix Companies, Inc.*, Case No. 12-cv-04926-SVW-AJW; Receiver's Notice of Related Case, Dkt. # 24.

because the Policies never matured.  Phoenix apparently wanted the Receiver to keep paying the premiums even though Phoenix refused to confirm that it would honor the Policies.  As demonstrated below, the Receiver has properly pled all four Causes of Action, and the Court should allow the Receiver to proceed with these claims.  Moreover, because the Receiver has rescinded the Policies – based, in part, on Phoenix's causing the consideration for the premium payments to fail by undermining the Policies and refusing to confirm that it will honor the Policies – and demanded return of the premiums paid, a real controversy certainly exists now, making the Receiver's claims ripe for adjudication.  The Court must deny Phoenix's Motion to Dismiss.[4]

## II.    ARGUMENT

### A.    The Receiver Properly Has Alleged Claims Upon Which Relief May Be Granted.

Phoenix's boilerplate argument that the Receiver has not pled a plausible theory of recovery completely ignores the numerous detailed allegations alleged in the FAC.  (FAC, ¶¶ 5-34.)  When ruling on a Rule 12(b)(6) motion, the court must construe the complaint liberally by viewing it in the light most favorable to the plaintiff.  *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996), *overruled on other grounds by Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007); *Parks Sch. Of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  The Court should accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations.  *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993).  Accordingly, the "issue on a motion to dismiss for

---

[4] The Court should also disregard the four exhibits Phoenix improperly attempts to attach to its Motion.  The FAC's allegations do not extensively quote or rely on any of the documents Phoenix attaches, and Phoenix further has not established the authenticity of these documents.  *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 998-99 (9th Cir. 2011) (as a general rule, the Court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, and documents not physically attached to the complaint may be considered by the Court only if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document).

DLA PIPER LLP (US)
LOS ANGELES

WEST\234779339.2                                     3
_____
RECEIVER'S OPPOSITION TO MOTION TO DISMISS FAC

failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted." *Villegas v. U.S. Bancorp*, No. C 10-1762, 2010 WL 2867424, at *2 (N.D.Cal. July 20, 2010). For a complaint to withstand a Rule 12(b)(6) motion to dismiss it need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Receiver has indeed pled sufficient factual allegations, and accordingly has provided Phoenix with "fair notice of what the claim[s are] and the grounds upon which [they] rest[.]" *Twombly*, 550 U.S. at 550.

The FAC alleges more than a sufficient amount of facts (which must be accepted as true) showing that:

- Phoenix has engaged in a scheme that promoted its issuance of STOLI policies in order to collect hefty life insurance premiums (FAC, ¶¶ 12-19);

- Phoenix issued STOLI policies which, at the very least, Phoenix was uncertain as to whether it would honor (FAC, ¶¶ 16, 18-20, 26-29, 33, 36-37 39; 43, 48-52, 59, 65);

- Phoenix now regularly attempts to avoid through litigation and otherwise its obligations under the same STOLI policies it promoted and denies/disputes claims for benefits at *three times* the rate of other companies (FAC, ¶¶ 17-19);

- Phoenix's conduct has jeopardized the validity of the Policies that the Receiver now holds and significantly impaired their value (FAC, ¶¶ 27-30, 32); and

- Phoenix's refusal to confirm whether it intended to honor the Policies has undermined the very essence of the coverage that is at the heart of these Policies (FAC, ¶¶ 17-19, 34, 52, 67).

Through its actions and conduct, Phoenix has destroyed the underlying consideration of the Policies, while at the same time seeking to retain the hefty premiums it collected on the Policies, which the Receiver now seeks to recover.

(FAC, ¶¶ 6, 12-20, 34, 36-37, 43, 65.)  All of these allegations, and more, are alleged in detail in the FAC and certainly form the required "cognizable legal theory" necessary for this case to proceed.  *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Phoenix's generic argument that the Receiver has not plausibly suggested an entitlement to relief fails.

**B.      The Receiver has Properly Stated a Cause of Action for Rescission Under California Civil Code Section 1689(b).**

   *i.      California law applies.*

The Receiver has more than adequately pled his claim for rescission.  (FAC, ¶¶ 35-46.)  Phoenix's first attack is that California Civil Code Section 1689(b) does not apply in this case.  Phoenix simply concludes that Wisconsin law applies in this case because the Policies were issued in Wisconsin and insure the lives of Wisconsin residents.  This is irrelevant.  The Policies do not contain any provisions stating that Wisconsin law applies and the insureds, regardless of where they now live, have no interest in the Policies.[5]  The aggrieved parties – the Receiver and PEMGroup – hold all interests in the Policies and are located in California.  (FAC, ¶¶ 1-4.)  Moreover, the Policies were purchased, sold, and maintained by the Receiver and/or PEMGroup in and from California.  (FAC, ¶¶ 1-4.)

Even if there were a choice of law provision in the Policies (which there is not), California Courts determine applicable law by analyzing "whether the chosen state has a substantial relationship to the parties or their transaction, ... or whether there is any other reasonable basis for the parties' choice of law." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002-3 (9th Cir. 2010) (*citing Nedlloyd Lines B.V. v. Superior Court*, 3 Cal.4th 459 (1992)).  "If...either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California." *Id.*  If the court finds such a conflict, it

---

[5] Further, Phoenix offers no support for its allegation that the insureds are currently Wisconsin residents.

1   "must then determine whether California has a materially greater interest than the

2   chosen state in the determination of the particular issue." *Id.* Phoenix's Motion

3   fails to even mention this standard – presumably because no choice of law

4   provision exists.  Even if one did exist, the Court should find that Wisconsin does

5   not have a substantial relationship to the parties, and therefore there is no

6   reasonable basis to prevent the Receiver from asserting claims under California

7   law.

8         Moreover, Phoenix fails to present, or even reference, the required standard

9   for a conflict of law claim.  California courts engage in a three-step process to

10  determine whether a foreign state's law governs an issue in an action brought in

11  California.  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010) (*citing*

12  *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal.4th 906, 921 (2001).)  The

13  California Supreme Court has summarized the process:

14        First, the court determines whether the relevant law of each of the

15        potentially affected jurisdictions with regard to the particular issue in

16        question is the same or different. Second, if there is a difference, the

17        court examines each jurisdiction's interest in the application of its

18        own law under the circumstances of the particular case to determine

19        whether a true conflict exists. Third, if the court finds that there is a

20        true conflict, it carefully evaluates and compares the nature and

21        strength of the interest of each jurisdiction in the application of its

22        own law "to determine which state's interest would be more impaired

23        if its policy were subordinated to the policy of the other state[,]" and

24        then ultimately applies "the law of the state whose interest would be

25        the more impaired if its law were not applied."

26  *Id.* (*citing Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 107-8 (2006)

27  (internal citations omitted).  A "party advocating the application of a foreign state's

28  law bears the burden of identifying the conflict between that state's law and

California's law on the issue, and establishing that the foreign state has an interest in having its law applied." *Quixtar, Inc.*, 601 F.3d at 995 (*citing Wash. Mut. Bank, FA*, 24 Cal.4th at 921.)  If it fails to meet either of these burdens, the Court "may properly find California law applicable without proceeding to the third step in the analysis." *Id.*  Here, Phoenix has completely failed to satisfy its burden, and accordingly California law must apply in this case.

Furthermore, as alleged in the FAC, this action is properly filed with this Court located in California on the basis that (1) this action is ancillary to the United States Securities and Exchange Commission proceedings pending in this Court; (2) the Receiver was appointed by this Court; (3) this action involves Receivership Assets within the meaning of the Preliminary Injunction and Orders Appointing a Permanent Receiver, which requires that all such disputes be filed with this Court; and (4) Phoenix operates and conducts business in California.  (FAC, ¶ 4.)  The law of a forum state (California) presumptively applies in a case, unless it is established that another state's law should apply.  *See Priyanto v. M/S Amsterdam*, No. CV 07-3811, 2009 WL 1160229, at *10 (C.D.Cal. April 27, 2009); *see also The Aspect Group v. Movietickets.com, Inc.*, No. CV 05-3125, 2006 WL 5894608, at *6 (C.D.Cal. January 24, 2006) (there is a "strong presumption in favor of applying the law of the forum state") (*citing Tobias v. Rivero,* No. C-90-1184-DLJ, 1992 U.S. Dist. LEXIS 2722, at *4 (N.D.Cal. Feb. 25, 1992).

As discussed above, Phoenix has neither demonstrated that another state's law should apply in this case, nor that California law should *not* apply.  Accordingly, California law applies to the rescission of the Policies, and at the very least, Phoenix's claims to the contrary should not prevent this action from proceeding.

        *ii.*     *The Receiver properly alleged his Rescission Claim.*

Pursuant to California Civil Code section 1689(b), a party to a contract may rescind the contract in the following cases:

(1) If the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party; or

(2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds; or

(3) If the consideration for the obligation of the rescinding party becomes entirely void from any cause; or

(4) If the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause; or for various other reasons listed under Section 1689(b); or …

(6) If the public interest will be prejudiced by permitting the contract to stand.  (Cal. Civ. Code § 1689.)

The Receiver has properly alleged rescission under each of these subsections.

As to subsection (b)(1), the Receiver alleged in detail that:  Phoenix issued the Policies, despite the fact that Phoenix knew or should have known that it would not honor its obligations under the Policies in all required circumstances, even after having collected hefty premiums; Phoenix ignored the applying agents' reputations and practices in the life insurance industry, the fact that Phoenix knew or should have known that the Policies would be re-sold as STOLI policies, and additional questionable information presented in the applications and initial premium payments for the Policies; Phoenix failed to disclose its knowledge, or take appropriate measures in response to this knowledge, and proceeded to issue the Policies in order to collect hefty premiums that currently amount to approximately $4,800,000, and that this conduct was an intentional device, scheme, act, connivance, and/or business practice which yielded significant profits to Phoenix to

the detriment of PEMGroup and the Receiver.  (FAC, ¶¶ 12-30, 35-46.)

PEMGroup was duped into purchasing and assuming the rights and obligations

under the Policies based on Phoenix's connivance, and accordingly is entitled to

rescission under Section 1689(b)(1).  (FAC, ¶¶ 35-46.)  Phoenix hollowly argues

that these "allegations are simply not actionable" under this section – but provides

no legal support for this assertion.  (*See* Motion, pp. 10-11.)

     As to the remaining subsections, the misconduct Phoenix has engaged in,

which is alleged in detail by the Receiver, indisputably caused the consideration for

the premium payments to fail.  (FAC, ¶¶ 12-30, 35-46.)  This misconduct includes,

for example, the fact that Phoenix aggressively promoted STOLI policies without

the intention of fulfilling its obligations under these policies and now regularly

attempts to avoid its obligations through a morass of litigation and/or denying

coverage at a significantly higher rate than the industry standard; and the fact that

because Phoenix has steadfastly refused to confirm whether it will fulfill its

obligations under the Policies in this case, Phoenix has caused the inherent

consideration provided by the Policies (i.e., insurance coverage) to fail.  (FAC, ¶¶

12-30.)  Further, in light of Phoenix's conduct towards STOLI policies and its

refusal to confirm these specific Policies, allowing these Policies to stand would

prejudice public interest by (1) allowing Phoenix to perpetuate its scheme against

members of the public who come into contact with Phoenix policies; and (2)

causing a Court-appointed Receivership Estate, that operates for the benefit of

victim investors, to have to make hefty premium payments towards Policies that

Phoenix does not intend to honor, or at best, is not willing to confirm.  (FAC, ¶¶ 12-

30.)  Thus, the Receiver is further entitled to rescission under Sections 1689(b)(2),

(3), (4) and (6) and has properly pled this Cause of Action.

     Phoenix attempts to make a distinction between the contracts which led

PEMGroup to acquire the rights and obligations under the Policies and the Policies

themselves, and claims that the Receiver (and PEMGroup) has no standing to

1  rescind the Policies because PEMGroup was not an original contracting party to the

2  Policies.  But PEMGroup when it obtained the Policies became the assignee of the

3  rights of the previous owners, so it does have the right to rescind.  (FAC, ¶¶ 10-11.)

4  Moreover,  PEMGroup has spent millions of dollars to successfully acquire and

5  maintain the Policies.  (FAC, ¶¶ 10-11, 26, 30, 37, 45, 52, 64.)  Indeed, PEMGroup

6  was duped into purchasing the Policies based on Phoenix's misrepresentations and

7  other improper actions as alleged in the FAC, and but for Phoenix's conduct,

8  PEMGroup would not have purchased and maintained the Policies.  (FAC, ¶¶ 11,

9  35, 46.)

10       In addition, Phoenix makes inconsistent arguments, thereby demonstrating

11  the lack of merit in its position.  On the one hand, Phoenix argues that the Receiver

12  has no standing to rescind the Policies because PEMGroup was not an original

13  contracting party.  (Motion, pp. 10-11.)  But on the other hand, Phoenix argues

14  against the Receiver's unjust enrichment claim on the basis that "the Policies

15  (contracts) govern the Receiver's and Phoenix's relationship…"  (Motion, p. 22.)

16  Phoenix cannot have it both ways.  PEMGroup has assumed and maintained the

17  rights and obligations under the Policies (at a cost of almost $5 million to date), and

18  accordingly has standing to rescind the Policies.  (FAC, ¶¶ 10-11, 26, 30, 37, 45,

19  52, 64.)

20       Phoenix next argues that the Receiver has failed to plead an actionable

21  misrepresentation or act of connivance on the basis that the insured under the

22  Policies are still living and therefore the parties do not yet know whether Phoenix

23  has misrepresented its obligations to pay benefits on the Policies.  (Motion, p. 11.)

24  Yet, regardless of whether the insureds are still alive, Phoenix has misrepresented

25  the coverage it claims it would provide in the Policies because it issued the Policies

26  with the intent of *deciding later* whether it would honor them.  Moreover, given the

27  allegations in the FAC, it would be unfair to require PEMGroup to continue making

28

1 hefty premium payments just to wait and see whether Phoenix will actually fulfill

2 its obligations under the Policies.  (FAC, ¶¶ 10-46.)

3        The primary benefit of purchasing life insurance is obtaining security through

4 the knowledge that death benefit proceeds will be paid at the time of a policy's

5 maturity.  This security is the heart of every life insurance policy.  Per the

6 Receiver's allegations in the FAC, as part of its scheme Phoenix freely issued

7 STOLI policies, which promise that Phoenix will pay benefits, yet Phoenix always

8 retained the option of not honoring the Policies when it was advantageous to do so.

9 (FAC, ¶¶ 12-19, 35-46.)  In other words, when representing that it would pay on the

10 insurance policies it issued upon maturity, Phoenix knew, or should have known,

11 that it may not.  (FAC, ¶¶ 12-19, 35-46.)  As a result of its practices, Phoenix has

12 become notorious for attempting to avoid its obligations through aggressive

13 litigation and/or denying coverage at a rate much higher than industry standard.

14 (FAC, ¶¶ 12-19, 35-46.)

15        With regards to the specific Policies at issue, Phoenix also flatly refused to

16 confirm that it will honor these policies.  (FAC, ¶¶ 20-30.)  Based on this

17 misconduct, Phoenix failed to provide the inherent consideration behind the

18 Policies, which is *knowing* coverage exists.  (FAC, ¶¶ 20-46.)  Phoenix knew, or

19 should have known, it would do this and accordingly issued the Policies through

20 misrepresentation and connivance.  Phoenix's misconduct left the Receiver with the

21 choice of continuing to pay millions of dollars in premiums for Policies that may

22 well never be honored, or rescinding the Policies.  The Receiver has chosen the

23 latter option, and as a result Phoenix must return the premiums paid.  (FAC, ¶¶ 35-

24 46.)

25        Phoenix contends that "the only consideration that could have failed is

26 Phoenix's failure to provide 'coverage' under the Policies."  (Motion, p. 12.)  This

27 is in fact what the Receiver has alleged in the FAC.  (FAC, ¶¶ 20-46.)  Phoenix then

28 suggests that knowing coverage would be provided is not part of the consideration

1   under the Policies.  Phoenix even tries to distract the Court with a list of different

2   types of insurance that do not guarantee coverage in an effort to argue that

3   "knowing" is not part of the consideration under the Policies.  (Motion, p. 12.)  This

4   is disingenuous, and sharply contrasts to the "peace of mind" sales pitches that

5   Phoenix's agents surely provide to potential customers.  Knowing one has coverage

6   is indisputably an inherent part of insurance contracts, and Phoenix has failed to

7   provide this in the Policies.

8         Phoenix continues to dance around whether it will honor the Policies, and

9   states that it is not contractually required to confirm so.  Phoenix also argues that it

10  is actually the Receiver who has created "uncertainty as to the parties' obligations

11  under the contracts…, not Phoenix."  (Motion, p. 13.)  This is hard to believe, given

12  Phoenix's specific conduct, its poor reputation, and outrageous refusal to confirm

13  its intentions to perform under the Policies are what caused the rescission of the

14  policies and this lawsuit.  (FAC, ¶¶ 12-46.)  Regardless of whether Phoenix is

15  contractually obligated to confirm that it will honor its obligations under the

16  Policies, given Phoenix's history of misconduct and its reputation in the industry,

17  the Receiver was well within the scope of his appointment to request confirmation

18  from Phoenix in order to evaluate the assets of the Receivership Estate and decide

19  whether he should keep paying premiums.  Indeed, it is neither fair nor prudent to

20  continue paying hefty premiums to an insurance carrier who will not confirm that it

21  will perform its obligations.  Thus, obviously it is Phoenix that is responsible for

22  the uncertainty that exists regarding coverage on the Policies.  In fact, the Receiver

23  has sought to eliminate that uncertainty by seeking confirmation, only to be rejected

24  by Phoenix.[6]  (FAC, ¶¶ 37-46.)

---

[6] Phoenix claims that both Wisconsin and California require that parties seeking verification of coverage under a life insurance policy provide the insurer with a form approved by that state's insurance department, citing Wisconsin Statutes section 632.29 and California Insurance Code section 10113.3.  This is not true.  Wisconsin Statutes section 632.29(11)(b)(4) merely requires a "provider" to submit requests for verification on approved forms.  Section 632.29(1)(p) explicitly states that a "purchaser" of a policy (i.e. PEMGroup) is not a "provider."  Similarly,

Phoenix attempts to downplay the misconduct for which it has become notorious in the secondary market of the life insurance industry. (Motion, pp. 14-15.) For example, Phoenix shrugs off its much higher coverage denial rate, but notably, does not dispute it. (Motion, p. 14.) Similarly, Phoenix admits that it seeks to void policies based on "misrepresentations" (which Phoenix probably would have caught, had it been less eager to issue faulty policies and collect the hefty premiums), but claims that it does so before each policy's contestability period.[7] (Motion, pp. 14-15.) Regardless of whether its lawsuits are brought before or after a contestability period, the fact remains (and the Receiver has alleged), Phoenix regularly fills courts' dockets with aggressive litigation that is designed to help Phoenix avoid its obligations on the same policies it eagerly issued. (FAC, ¶ 17.) Furthermore, there is at least one other lawsuit in this District alone that asserts similar claims against Phoenix as this action does.[8]

Finally, while the FAC makes no allegations regarding the insurable interest of the Policies, Phoenix jams an insurable interest argument and a Wisconsin statute into its moving papers. (Motion, pp. 14-15.) Rather than actually confirm the Policies in good faith, Phoenix skirts around this point and instead asserts that the Policies are past contestability and that the wording of a Wisconsin statute supports the validity of the Policies. *Id.* The Court should not allow Phoenix to pretend these policies are valid and will be enforced, when Phoenix refuses to

California Insurance Code section 10113.3(a) and (b) require only providers to make requests for coverage on approved forms. And, sections 10113.1(r) and (s) expressly exclude "purchaser" from the definition of "provider." Accordingly, contrary to Phoenix's assertion, the Receiver and PEMGroup were not required to request verification on *approved* forms. This is yet another false argument by Phoenix.

[7] Again notably, Phoenix nowhere says that its denials of claims for death benefits always occur before the expiration of the contestability period.

[8] *See* Complaint filed on June 5, 2012 in *Wilmington Savings Fund Society, FSB, et al. v. PHL Variable Insurance Company, Phoenix Life Insurance Company, and the Phoenix Companies, Inc.*, Case No. 12-cv-04926-SVW-AJW; Receiver's Notice of Related Case, Dkt. # 24.

1   directly confirm this point.  (FAC, ¶¶ 27-30.)  Phoenix's arguments confirm its

2   failure to provide actual coverage under these Policies.

3        The Receiver's allegations in support of his rescission claim are far from

4   conclusory and based on specific facts.  (FAC, ¶¶ 12-46.)  Through its misconduct

5   and refusal to confirm the Policies, Phoenix has caused the underlying

6   consideration of the Policies to fail.  (FAC, ¶¶ 17-19, 34, 52, 67.)  Indeed, to this

7   day, nobody knows whether Phoenix intends to honor its obligations under the

8   Policies, and yet Phoenix still expects to retain and be paid life insurance

9   premiums.  The Receiver must be allowed to proceed with his claim for relief based

10   upon rescission in order to recover the funds that were paid.

11       **C.**    **The Receiver has Properly Stated a Cause of Action for**

12              **Declaratory Relief.**

13        The Receiver has clearly alleged that:  Phoenix issued the Policies, despite

14   Phoenix's knowledge that it would retain the right to contest the Policies and

15   therefore would refuse to confirm whether it would honor its obligations under the

16   Policies in the future, negating any consideration it provided in exchange for the

17   policy premium payments; Phoenix did so in order to generate income and profits

18   for itself as part of Phoenix's scheme to turn a blind eye to the STOLI policies it

19   issued; Phoenix has in fact been paid approximately $4,800,000 in premium

20   payments by PEMGroup and the Receiver (and related parties), based on those

21   parties' reasonable reliance that Phoenix issued valid life insurance policies for

22   which Phoenix would honor its obligations and that this would provide the certainty

23   of coverage that is at the heart of owning a life insurance policy; Phoenix has in fact

24   refused to confirm whether it intends to honor its obligations under the Policies, and

25   by its actions, has indicated that it will not honor the Policies; and consistent with

26   its scheme, Phoenix has refused to return any of the premiums it has collected under

27   the Policies.  (FAC, ¶¶ 12-34, 47-54.)  Based on the foregoing, the Receiver alleged

28   that PEMGroup and the Receiver are entitled to a judicial declaration that the

Policies Phoenix issued were void *ab initio* or voidable, that no additional insurance premiums are due on the Policies, and that Phoenix must return all premiums paid for the Policies to the Receiver.  (FAC, ¶ 54.)

Phoenix attempts to funnel this Cause of Action into a "fraud in the inducement" claim and re-argues that there was no "actionable misrepresentations" because PEMGroup was not an original contracting party of the Policies.  (Motion, pp. 16-17.)  This is not true.  As discussed above, the primary benefit of purchasing life insurance is obtaining security through the knowledge that death benefit proceeds will be paid at the time of a policy's maturity.  This is the heart of these Policies.  Based on its misconduct detailed herein and alleged in the FAC, Phoenix refuses to provide and has undermined that security, thereby failing to provide the consideration behind the Policies.  (FAC, ¶¶ 12-34, 47-54.)  Phoenix knew, or should have known, it would do this and accordingly issued the supposedly valid Policies through misrepresentation.  (FAC, ¶¶ 49-51.)

PEMGroup was a foreseeable third-party purchaser of the Policies and has now spent millions of dollars (which Phoenix refuses to return) to acquire and maintain the rights and obligations under the Policies.  (FAC, ¶¶ 8-11, 26, 30, 37, 45, 52.)  Of course, PEMGroup did so based on its belief that Phoenix issued valid policies that would actually provide coverage.  (FAC, ¶¶ 8-11, 47-54.)  Yet, Phoenix has failed to provide such coverage.  (FAC, ¶¶ 27-34, 47-54.)  Accordingly, PEMGroup was duped into purchasing the Policies based on Phoenix's misrepresentations that its Policies would provide valid coverage (i.e., would not be rescinded or unconfirmed at a later date), and but for Phoenix's misrepresentations, PEMGroup would not have purchased and maintained the Policies.  (FAC, ¶¶ 11, 35, 46.)  Therefore, actionable misrepresentations were made to PEMGroup, even though it was not an original contracting party.

Phoenix next argues that the Receiver is not entitled to rescission and a refund of premiums if the Policies involve misrepresentations by the insureds or are

otherwise faulty.  (Motion, pp. 18-19.)  This is yet another distraction.  The FAC includes no allegations pertaining to representations made by the insureds.  Rather, the premiums paid towards the Policies should be returned to PEMGroup because Phoenix has failed to provide actual coverage, instead providing the mere illusion of coverage.  (FAC, ¶¶ 17-19, 34, 52, 67.)  Phoenix has failed to provide what it promised by virtue of issuing these policies, and accordingly the Receiver is entitled to proceed with his declaratory relief claim.  Indeed, even if Phoenix's argument that it carried insurance risk on the Policies for the past seven years is true (and it is not because Phoenix did not intend to honor the Policies), the claim needs to be litigated, not dismissed prematurely.

### D.  The Receiver has Properly Stated a Cause of Action for Negligence.

The Receiver more than adequately pleads his negligence claim under both standards provided by Phoenix.  (FAC, ¶¶ 55-61.)  A "negligence claim under California law requires plaintiff to allege that defendant owed [plaintiff] a legal duty, breached that duty, and that the breach was a proximate legal cause of [plaintiff's] injury."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 754 F.Supp.2d 1208, 1223 (C.D.Cal. 2010).

The FAC specifically alleges that Phoenix had statutory and common law duties to use a reasonable degree of skill and care in conducting its business, which includes issuing life insurance policies.  (FAC, ¶¶ 55-61.)  Phoenix owed these duties to the parties to whom it issued life insurance policies, as well as the secondary market purchasers who Phoenix undeniably knew would acquire these policies (e.g., PEMGroup).  (FAC, ¶¶ 56-58.)  Phoenix breached its duties to use a reasonable degree of skill and care by, among other things, issuing the Policies despite its knowledge that it would not honor, or not confirm its intentions to honor, the Policies, and ignoring and/or failing to investigate the parties applying for and obtaining interests to the Policies.  (FAC, ¶¶ 12-26, 59.)  Phoenix further breached

1    its duties to use a reasonable degree of skill and care by turning a blind eye to the

2    facts surrounding the life insurance policies it issued in order to maximize its

3    revenue from premiums, while at the same time planning to avoid its obligations

4    under these policies and still keep the premiums it collected.  (FAC, ¶¶ 12-26, 60.)

5    And, Phoenix's breaches of these duties have caused PEMGroup and the Receiver

6    to suffer significant damages.  (FAC, ¶¶ 8-26, 30, 61.)  The Receiver has pled every

7    required element, and Phoenix's objections to the Receiver's negligence claim fail.

8        As in its previous Motion to Dismiss, Phoenix disputes whether it owes

9    PEMGroup a duty of skill and care.  (Motion, pp. 19-20.)  However, the Receiver

10   specifically pleads that Phoenix owed these duties to the parties to whom it issued

11   life insurance policies, and the Receiver stands in their shoes.  (FAC, ¶¶ 56-58.)  In

12   addition, the Receiver alleged that Phoenix owed the duty to the secondary market

13   purchasers who Phoenix undeniably knew would acquire these policies.  (FAC, ¶¶

14   56-58.)  Phoenix was well aware that its policies would be sold to secondary market

15   purchasers, and at times, even purchased its own policies through a subsidiary of its

16   parent corporation.  (FAC, ¶¶ 56-58.)  Phoenix profited tremendously from its

17   knowing and express issuance of STOLI policies, and cannot deny that it owed a

18   duty to foreseeable secondary market purchasers.  Indeed, based on documents and

19   communications in the underwriting files for the Policies, and the applications for

20   the Policies, Phoenix undeniably knew that these Policies would be re-sold.  (FAC,

21   ¶¶ 20-26, 56-58.)  Moreover, PEMGroup purchased and assumed all ownership and

22   beneficiary rights under the Policies.  (FAC, ¶¶ 10-11, 58.)  The Receiver has

23   clearly pled that Phoenix owes legal duties, through multiple channels, to both

24   PEMGroup and the Receiver.  (FAC, ¶¶ 56-58.)

25       Phoenix further claims that the Receiver has not alleged any deficiencies

26   with the Policies.  (Motion, pp. 20-21.)  This is obviously not true, and also appears

27   to be a factual argument, not one to be decided on a motion to dismiss.  To be clear

28   (and as alleged in the FAC) the Policies are faulty, in part, because Phoenix issued

them without properly investigating the applications, and with the knowledge that it would retain the option of not honoring the Policies, and therefore refuse to confirm its intentions to honor the Policies, which in turn destroyed the underlying coverage the Policies are intended to provide.  (FAC, ¶¶ 20-34, 55-61.)  By issuing these faulty Policies, Phoenix breached its duties of skill and care, and has caused PEMGroup significant damages.  (FAC, ¶¶ 8-26, 30, 61.)  Thus, the Receiver should be permitted to proceed with his negligence claim.  Indeed, at this stage of the case the Court should accept as true all factual allegations in the FAC and allow the Receiver to proceed with his well pled claims.  *Firebaugh Canal*, 10 F.3d at 670.

### E.  The Receiver has Properly Stated a Cause of Action for Unjust Enrichment.

The Receiver properly pleads his unjust enrichment claim.  (FAC, ¶¶ 62-69.)  By its wrongful acts and omissions, Phoenix has been unjustly enriched at the expense of and to the detriment of PEMGroup and the Receiver in an amount of approximately $4.8 million.  (FAC, ¶¶ 64-66.)  Phoenix collected hefty insurance premiums under the Policies it improperly issued and the validity of which Phoenix now refuses to confirm.  (FAC, ¶¶ 27-34, 64-66.)  Phoenix's refusal to confirm its intentions to honor its obligations under the Policies invalidates the certainty of coverage on the Policies, which is further confirmed by Phoenix's conduct and actions with regards to similar life insurance policies it has issued.  (FAC, ¶¶ 12-19, 64-67.)  The Receiver's unjust enrichment claim is based on the fact that Phoenix has undermined the Policies, yet accepted millions of dollars in premium payments.  It took the premiums even though it bore no real risk.  Now, Phoenix is attempting to walk away with the premiums paid, and has provided nothing to PEMGroup or the Receiver in exchange.

Phoenix argues that the Receiver cannot assert an unjust enrichment claim on the basis that the Policies are enforceable, binding agreements that define the rights

1   of the parties.  (Motion, pp. 21-22.)  This is sharply at odds with Phoenix's refusal

2   to confirm whether it will honor the Policies.  Based on Phoenix's misconduct and

3   refusal to confirm the policies, enforceable, binding agreements do <u>not</u> exist in this

4   case and it is completely appropriate to bring this unjust enrichment claim.  Indeed,

5   the FAC specifically alleges that the "Policies at issue in this case do not preclude

6   this cause of action because Phoenix refused to confirm that they are binding,

7   enforceable agreements, thereby obligating the Receiver to bring this unjust

8   enrichment claim."  (FAC, ¶ 68.)

9       Phoenix further points to a narrow exception where restitution may be

10  awarded when a contract is unenforceable or ineffective for some reason.  *See Boon*

11  *Rawd Trading Int'l Co., Ltd. v. Paleewong Trading Co., Inc.*, 688 F.Supp.2d 940,

12  956 (N.D.Cal. 2010).  Again, that is exactly the case here.  The Receiver alleges

13  claims for rescission of the Policies, declaratory relief confirming the policies are

14  void, and negligence, precisely because Phoenix has made the Policies

15  unenforceable and ineffective through its conduct.  (FAC, ¶¶ 12-34,  64-67.)

16  Assuming these allegations as true, as the Court must, the Receiver's unjust

17  enrichment claim is also appropriate on these grounds.

18      Finally, Phoenix argues that because the insureds are still alive and no benefit

19  claims have been made, we cannot yet determine whether Phoenix has been

20  unjustly enriched.  (Motion, p. 23.)  However, this completely ignores the fact that

21  Phoenix, through its misconduct and refusal to confirm the Policies, has already

22  destroyed the consideration of knowing coverage will be provided by the Policies.

23  (FAC, ¶¶ 12-34,  64-67.)  Per the FAC's allegations, the Policies have already been

24  invalidated and Phoenix has collected close to $4.8 million in premiums.  (FAC, ¶¶

25  10-34, 64-67.)  Phoenix has already been unjustly enriched by taking the premiums

26  but bearing no real risk, and the Receiver should be permitted to proceed with his

27  claim.

28

**F.     The Receiver's Claims are Ripe for Judicial Determination.**

Phoenix's last attempt at challenging the FAC is to argue that the Receiver's claims are unripe.  (Motion, pp. 23-24.)  Phoenix specifically argues that because the death benefits are not due on the Policies and because Phoenix has neither confirmed nor denied its intentions to honor the Policies, that this action is not ripe for judicial determination.  *Id.*  In making this argument, Phoenix steadfastly ignores the fact that the Receiver has rescinded the Policies and demanded the return of the premiums.  (FAC, ¶¶ 31-54.)  Phoenix's argument fails at every level.

The ripeness doctrine requires that there exist a "case or controversy" and that "the issues presented are definite and concrete, not hypothetical or abstract." *U.S. v. Rodriguez-Rodriguez*, 441 F.3d 767, 771 (9th Cir. 2006) (internal citations omitted).  This lawsuit is ripe for judicial determination on multiple grounds.  As detailed above, Phoenix's refusal to confirm whether it will honor its obligations under the Policies, and its public efforts to avoid its obligations under similar life insurance policies, eliminated or diminished the value of the Policies.  (FAC, ¶¶ 12-34.)  As a result, the Receiver has rescinded the Policies and demanded the premiums back.  (FAC, ¶¶ 31-54.)  This gives rise to the Receiver's claims at this time.

This dispute is further ripe for judicial determination because Phoenix currently expects the Receiver and PEMGroup to continue making significant premium payments towards the Policies, while refusing to confirm whether Phoenix will honor the Policies.  (FAC, ¶¶ 27-34.)  *At best*, it is uncertain whether Phoenix would ever honor its obligations, and this uncertainty destroyed the very essence of the insurance relationship.  It is therefore crucial to have a judicial determination on the Receiver's claims now.  Had the Receiver not rescinded the Policies, he may have been obligated to pay more premiums to Phoenix, without any confirmed future benefit and in furtherance of Phoenix's scheme that the

1  Receiver has described above and in the FAC.  (FAC, ¶¶ 12-34.)  The Receiver

2  cannot squander the Receivership Estate in this way.

3          Finally, this controversy is ripe for judicial determination on the basis that

4  Phoenix has failed to provide certainty of *coverage* under the Policies.  (FAC, ¶¶

5  12-34.)  The primary benefit of purchasing life insurance is obtaining security

6  through the knowledge that death benefit proceeds will be paid at the time of a

7  policy's maturity.  This security is the heart of every life insurance policy.  Phoenix

8  refuses to provide and has undermined that security, thereby failing to provide the

9  inherent consideration behind the Policies.  (FAC, ¶¶ 12-34.)  Therefore, Phoenix

10 has caused the consideration it provided to the policy holders, including PEMGroup

11 and the Receiver, to fail.  As a result, the Receiver is forced to rescind the Policies

12 now and seek the return of premiums paid.

13         Thus, contrary to Phoenix's assertions, this action is ripe for judicial

14 determination and should be permitted to proceed.

15 **III.   CONCLUSION**

16         Based on the foregoing, the Receiver respectfully requests the Court to deny

17 Phoenix's Motion to Dismiss in its entirety and allow the Receiver to proceed with

18 his claims.

19         If, however, the Court is inclined to grant any part of the Motion, the

20 Receiver requests leave to amend the FAC.  *See* Fed. R. Civ. P. 15(a) (leave to

21 amend "shall be freely given when justice so requires").  The Receiver also expects

22 discovery will provide further evidentiary support for his claims.

23 Dated:  July 16, 2012                        **DLA PIPER LLP (US)**

24

25                                      By   /s/ NICK S. PUJJI
                                         EDWARD D. TOTINO
26                                       NICK S. PUJJI
                                         Attorneys for Plaintiff
27                                       Receiver Robert P. Mosier

28